**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MANJULABEN T. PATEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:11cv0539 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the

application of Manjulaben Patel for disability insurance benefits (DIB) under Title II of the

Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned United States

Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c). Ms. Patel has

filed a brief in support of her complaint; the Commissioner has filed a brief in support of

his answer.

## Procedural History

Manjulaben Patel (Plaintiff) applied for DIB in April 2007, alleging a disability as

of May 31, 2003, caused by diabetes, high blood pressure, heart problems, high cholesterol,

mental problems, headaches, and body pain. (R.[1] at 113-20.) Her application was denied

---

[1]References to "R." are to the administrative record filed by the Commissioner with his
answer.

initially[2] and after a hearing held in May 2009 before Administrative Law Judge (ALJ) Robert E. Ritter.  (Id. at 8-65.)  The Appeals Council denied her request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel; Jeffrey F. Magrowski, Ph.D., a vocational expert (VE); and Henry Dralle Onken, M.D., testified at the administrative hearing.  Plaintiff's husband testified and also acted as interpreter for his wife, who spoke Hindu and had "very limited English skills."  (Id. at 24.)

Plaintiff testified that she was then 52 years old, married, and had three children at home, one who was 32 years old, one who was 25, and one who was 19.  (Id. at 28.)  She graduated from high school.  (Id. at 29.)

Plaintiff last worked doing housekeeping in Bowling Green, Kentucky, approximately five years earlier.  (Id. at 29-30.)  She had to leave that job because of medical problems.[3]  (Id. at 30.)  She can no longer work an eight-hour day or forty-hour week because of her high blood pressure, blood sugar problems, and pain in her lower back, chest, knee, and belly. (Id.)  Her back pain has been bothering her for five to six years.  (Id. at 31.)  Her knees are sore and painful and cramp up if she has to be in one position for

---

[2]An earlier DIB application had been denied at the initial stage in January 2006. (Id. at 132.)

[3]An agency interviewer reported that Plaintiff left work on May 31, 2003, for non-medical reasons.  (Id. at 134.)

long.  (Id.)  She becomes short of breath if she walks farther than thirty feet.  (Id. at 32.)

She has diabetes, which causes blurred vision.  (Id.)  She is 4 feet and "something" tall[4] and

weighs 200 pounds.  (Id.)  Her diabetes medication caused her to gain weight.  (Id. at 33.)

She has pain in her right wrist.  (Id.)  If she bends over at the waist, her stomach is full of

pressure and makes her vomit.  (Id. at 34.)  Almost every day, her medications cause

diarrhea, drowsiness, joint pain, and swollen ankles.  (Id. at 34-35.)  Her medication helps

her sometimes, but not all the time.  (Id. at 35.)

Plaintiff does all the household chores, but it takes time.  (Id.)  She can sit for

approximately one hour before having to get up and walk.  (Id. at 36.)  She can stand for no

longer than twenty minutes before having to sit and can walk no farther than a block.  (Id.)

She does not have a driver's license and never has had.  (Id. at 36-37)  She has to lie down

four to five times during the day for one or two hours.  (Id. at 37.)  When she lies down, she

falls asleep because of the medication she is taking.  (Id.)  She has a headache every day.

(Id. at 39.)  The heaviest item she can lift is ten pounds.  (Id. at 43.)

Mr. Patel testified that Plaintiff probably takes all day to do the household chores

and gets help from their sons or him to finish.  (Id. at 40-41.)  The longest he has seen her

doing a chore before having to take a break is one hour.  (Id. at 41.)  The length of time she

can work depends on how strenuous the chore is.  (Id.)  She constantly complains about the

pain.  (Id. at 42.)  Her doctors work on one of her problems at a time; now, they are

concerned with her diabetes.  (Id.)  She has occasional boils on her back.  (Id.)

---

[4]Her state identification card lists her height as 4 feet 11 inches tall.  (Id. at 40.)

Dr. Onken inquired if Plaintiff still has the symptoms of depression, e.g., not being happy, not sleeping well at night, being nervous, feeling there was something wrong, having decreased energy and difficulty concentrating, that Dr. Sutter had observed in 2007. (Id. at 45.) She did not see Dr. Sutter – he was the state agency doctor who reviewed the documentary evidence – but she still has those symptoms. (Id. at 46.) She has a couple of crying spells a day; each lasts approximately ten minutes. (Id. at 47.)

Dr. Onken testified that Plaintiff's diabetes should be under control, noting that she did not take her insulin regularly. (Id.) "[H]er trouble walking and lifting and squatting is serious." (Id. at 48.) He could not "see her doing a lot of physical work . . . ." (Id.) Her weight – she is morbidly obese – stressed her joints and prevented her from sitting down for a long period of time without having to get up. (Id. at 48-49.) He classified her mental disorder as depression with anhedonia,[5] appetite disturbance and change of weight, sleep disturbance, decreased energy, and psychomotor agitation. (Id. at 49.) This classification was based on her demeanor and testimony at the hearing. (Id.)

Dr. Onken further testified that Plaintiff's cardiac function had improved since she had stents placed in November 2005, March 2006, and July 2006. (Id.) Her swollen legs could be due to angina or to her weight. (Id. at 49-50.) He noted that her ejection fraction had improved; indeed, in August 2007 it was 65 percent and normal was 55. (Id. at 50.) A person with Plaintiff's June 2007 ejection fraction of 45 percent would be limited to

---

[5] Anhedonia is the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedman's Medical Dictionary, 90 (26th ed. 1995).

sedentary work.  (Id.)  She did not have any environmental restrictions.  (Id. at 51.)  Her

weight contributed to her difficulty walking farther than one block without becoming short

of breath.  (Id. at 51-52.)  He thought she should probably undergo a pulmonary function

test and another psychiatric evaluation.  (Id. at 52.)  He opined that much of her depression

might be attributable to her inability to speak English and resulting feelings of isolation.

(Id.)  Physically she was limited to lifting ten pounds occasionally and no bending,

stooping, squatting, walking for distances, and kneeling.  (Id.)

        The ALJ asked the VE whether there was any work activity Plaintiff could perform

on a sustained basis if he found Plaintiff to be credible when describing a need to rest up

to five times a day for an hour.  (Id. at 53-54.)  The VE replied that there were not.  (Id. at

54.)  The ALJ then asked the VE to assume that Plaintiff had the physical limitations

described by Dr. Onken and also could stand and walk with normal breaks no more than

two hours intermittently throughout an eight-hour workday; could sit with normal breaks

for six hours; could only occasionally stoop, kneel, crouch, crawl, balance and climb ramps

and stairs; could not climb ropes, ladders, or scaffolding; and should avoid concentrated

exposure to hazardous work setting, extreme cold, high levels of humidity, and violent body

vibrations.  (Id. at 54-55.)  The VE testified that she could not return to her past work, but

would be able to perform a wide range, i.e., 80 to 90 percent, of sedentary[6] work.  (Id. at

55.)  She did not have any transferable skills she could use in that hypothetical.  (Id.)  If

---

[6]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking
and standing."  20 C.F.R. § 404.1567(a).

Plaintiff's English language difficulties exhibited at the hearing was added to the hypothetical question, 50 percent of sedentary work would be eliminated.  (Id. at 55-56.)

The ALJ then asked the VE to assume a third hypothetical claimant who, in addition to earlier-described limitations, had a depressive condition that would cause her to be unable to engage in work that was more than simple, routine, or repetitive and where she did not have to inter-relate with co-workers or the general public.  (Id. at 56.)  The VE replied that 60 to 70 percent of sedentary jobs would be eliminated.  (Id. at 56.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and reports of evaluations of her physical and mental impairments.

When applying for DIB, Plaintiff completed a Disability Report, listing her height as 4 feet 11 inches and her weight as 236 pounds.  (Id. at 161-69.)  She can speak and understand English.  (Id. at 161.)  Her ability to work is limited by diabetes, high blood pressure, heart problems, cholesterol, mental problems, headaches, and body pain.  (Id. at 162.)  She cannot bend over, has chest pain, easily gets out of breath and tired, is not proficient in English,[7] is always depressed, has poor vision, has memory problems, and cannot walk up and down stairs.  (Id.)  These impairments first bothered her on April 1,

---

[7]The seeming inconsistency between this and her "Yes" to the question whether she can speak and understand English is not explained.  It was noted on the form that if she could not speak and understand English, an interpreter would be provided free of charge.

2000, and prevented her from working on May 31, 2003. (Id.) She stopped working then because she had only worked six weeks. (Id.) Plaintiff completed the 11th grade in 1974. (Id. at 168.) She had not been in special education classes. (Id.)

Plaintiff also completed a Function Report. (Id. at 145-52.) Asked to describe her daily activities, she reported that she does household chores, but requires a lot of resting. (Id. at 145.) She tries to walk, but runs out of breath. (Id.) She takes care of her husband and children, who assist with the household chores. (Id. at 146.) She can go outside alone and shops for clothes. (Id.) She walks or rides in a car; she does not use public transportation. (Id.) Before her impairments, she was able to work longer hours and spend more time outside. (Id.) Her impairments make her sleep more; they do not affect her personal grooming tasks. (Id.) She daily cooks vegetarian dishes; these take thirty minutes. (Id. at 147.) Her interests include watching television and cooking. (Id. at 149.) Her impairments adversely affect her abilities to lift, squat, bend, walk, kneel, and climb stairs. (Id. at 150.) They do not affect her abilities to stand, sit, reach, concentrate, remember, complete tasks, or get along with others. (Id.) She follows instructions, gets along with authority figures, and handles stress well. (Id. at 150-51.) She does not have a problem handling changes in routine. (Id. at 151.)

On a Work History Report, Plaintiff listed two jobs, one in housekeeping from 1994 to May 31, 2003, and one as a stocker in a convenience store from June 2000 to August 2000. (Id. at 153-60.) When working as a housekeeper, she cleaned motel rooms. (Id. at 154.) This required that she walk, stand, climb, stoop, kneel, and crouch for a total of five

hours each in a day.  (Id.)  Also for five hours each in a day, she handled, grabbed, or grasped big objects; wrote, type, or handled small objects; and reached.  (Id.)  The heaviest weight she lifted was twenty pounds; the weight she frequently lifted was less than ten pounds.  (Id.)

An earnings report for the years 1983 to present listed 2003 as the last year in which Plaintiff had earnings.  (Id. at 126.)  Her earnings that year were $5,246, her sixth highest amount.  (Id.)  Her highest amount was $18,209 in 1999, followed by $10,406 in 1998, and then $8,947 in 1997.  (Id.)  In 2000, she earned $5,876; in 2002, she earned $5,881.  (Id.) In the eight remaining years in which she had earnings, her highest amount was $3,974.25, in 1996.  (Id.)  Her lowest earnings were $81, in 2001.  (Id.)  In the ten years for which an employer is listed, Plaintiff worked for eight different companies, three of which had "Patel" in the business name.  (Id. at 128-30.)  All were in the motel or hotel business.  (Id.) In two of those ten years, she was self-employed.  (Id. at 128.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 178-85.)  Since completing the initial Disability Report, her impairments had worsened in that she had difficulty eating, her medications were causing her to gain weight, and her legs swelled every time she climbed stairs.  (Id. at 179.)  The date these changes had occurred was unknown.  (Id.)  She did not have any new impairments.  (Id.) On a separate section, she listed fourteen medications; none had any side effects.  (Id. at 181-82.)  Her impairments affected her ability to care for her personal needs in that she had trouble moving, bending, reaching, and walking.  (Id. at 183.)

The relevant medical records before the ALJ are summarized below in chronological and begin when Plaintiff consulted Naginder Sharma, M.D. (N. Sharma), on January 24, 2006, with complaints of recurrent chest pain during the past year. (Id. at 309-17, 397-405.) The pain, described as tightness, occurred with exertion, i.e., walking fifty yards, and was relieved with rest. (Id. at 313.) She had undergone a cardiac catherization in India when visiting there the previous November and been diagnosed with three-vessel coronary artery disease. (Id. at 313, 315.) When in the office, Plaintiff's blood pressure was high; she was started on Toprol. (Id. at 314.) Her cholesterol was also high; she was started on Lipitor. (Id.) It was noted that she had diabetes mellitus. (Id.) After a discussion with Dr. N. Sharma, Plaintiff elected to proceed with a coronary angiogram, a percutaneous transluminal coronary angioplasty (PTCA),[8] and stent of the right coronary artery. (Id. at 317.)

Six days later, Dr. N. Sharma performed a coronary arteriography[9] with PTCA and stent deployment of the right coronary artery. (Id. at 217-23, 301-08, 383-89.) Plaintiff was released the following day with diagnoses of chronic stable angina, normal left ventricle systolic function, hypertension, diabetes mellitus, dyslipidemia,[10] and obesity. (Id. at 217.)

_____

[8]PTCA "is a minimally invasive procedure to pen up blocked coronary arteries, allowing blood to circulate unobstructed to the heart muscle." U.S. Nat'l Library of Medicine, Percutaneous transluminal coronary angioplasty (PTCA), http://www.nlm.nih.gov/medlineplus/ency/anatomyvideos/000096.htm (last visited Feb. 21, 2012).

[9]Arteriography is "[v]isualization of an artery or arteries by x-ray imaging after injection of a radiopaque contrast medium." Stedman's Medical Dictionary at 134.

[10]Dyslipidemia is an abnormal level of lipids. Kristie Reilly, Dyslipidemia, http://cholesterol.about.com/lw/Health-Medicine/Conditions-and-diseases/Dyslipidemia-.htm (last

Discharge instructions included no lifting of anything heavier than ten pounds for two weeks.  (<u>Id.</u> at 218.)  It was noted that she had a 70-80% midcircumflex artery stenosis which would soon need percutaneous intervention.  (<u>Id.</u> at 223.)  It was also recommended that she consider percutaneous intervention of the terminal portion of the left atrial diameter, that she take aspirin and Plavix for a minimum of six months, and that she take aggressive lipid-lowering medications.  (<u>Id.</u>)  Her home medications included Lipitor, Toprol, Imdur (to dilate blood vessels), Avandia (to improve glycemic control in people with diabetes mellitus), "and two other medications for blood pressure that she is unaware of."  (<u>Id.</u> at 218.)

Two weeks later, Dr. N. Sharma saw Plaintiff for a follow-up visit.  (<u>Id.</u> at 295-300, 377-82.)  He noted that her angina had significantly improved and she had "done very well" since her angioplasty and stenting but continued to experience left-sided chest discomfort.  (<u>Id.</u> at 296.)  Her blood pressure was stable.  (<u>Id.</u> at 297.)  Plaintiff was to undergo a catherization and stenting of the mid segment of obtuse marginal artery.  (<u>Id.</u>)  She did so on March 7.  (<u>Id.</u> at 213-16, 289-94, 367-71.)  She was discharged the day following the stenting.  (<u>Id.</u> at 213, 289.)

On March 22, Plaintiff saw Dr. N. Sharma for a follow-up visit.  (<u>Id.</u> at 284-88, 362-66.)  She continued to have shortness of breath on exertion but no other problems.  (<u>Id.</u> at 287.)  She reported that she felt that she had "done quite well."  (<u>Id.</u>)  Her hypertension was

---

visited Feb. 21, 2012).  One of the most common types is high cholesterol.  <u>Id.</u>

well controlled.  (Id. at 288.)  Her total cholesterol was down to 97; she was continued on Lipitor.  (Id.)

Plaintiff returned to Dr. N. Sharma on July 19 with complaints of right chest pain for the past two weeks and shortness of breath when walking approximately 100 yards.  (Id. at 278-83, 355-60.)  She also had right arm pain associated with the chest pressure and "some complaints of chest heaviness when bending over."  (Id. at 282.)  The episodes usually resolved with rest.  (Id.)  To investigate her complaints, Plaintiff underwent a nuclear medicine cardiac perfusion study and stress test.  (Id. at 208-11, 274-77, 282, 347-52.) These revealed a large area of reversible count activity involving the inferolateral anterior walls consistent with ischemia, interior apical hypokinesis, and a diminished left ventricular ejection fraction of 45%.  (Id. at 208.)  An echocardiogram performed the following week, on August 2, showed a normal left ventricle size and systolic function with an estimated ejection fraction of 60% and akinesis of the inferior base and posterior base of the left ventricle.  (Id. at 206-07.)  All else was normal, including the right ventricle.  (Id.)  Dr. N. Sharma recommended that she undergo cardiac catherization, including angioplasty and stenting if necessary.  (Id. at 271-73, 344-46.)

Consequently, on August 8, Plaintiff underwent a cardiac catherization.  (Id. at 200–07, 253-56,[11] 261-63, 334-36, 327-29.)  Plaintiff then had a normal left ventricular size and systolic function and an estimated ejection fraction of 60%.  (Id. at 207.)

---

[11]Plaintiff cites these pages as evidence of another catherization on September 5.  The date of September 5 refers to when the discharge summary was written.  The summary is of the August 8 catherization.

Plaintiff returned to Dr. N. Sharma two weeks later for a follow-up visit. (Id. at 257-60, 330-33.) She reported having continuing nonexertional episodes of subternal chest pain that were relieved by back rubs. (Id. at 259.) Dr. N. Sharma opined that this pain was atypical for cardiac ischemia and might be precursors of gastroesophageal reflux. (Id.) She was started on over-the-counter Prilosec. (Id.) Her weight was 222 pounds. (Id. at 257.) She was not depressed. (Id.) Her hypertension medication, then Vasotec, dosage was increased. (Id. at 260.) She was to continue taking Lipitor. (Id.)

X-rays of Plaintiff's chest taken on September 13 showed mild cardiomegaly.[12] (Id. at 199.)

Plaintiff consulted Shant A. Parseghian, M.D., a physician at Skaggs Diabetes and Endocrinology Care on November 1. (Id. at 239-43.) She denied having any blurred or loss of vision, diarrhea, swelling, musculoskeletal pain or swelling, and depression or anxiety. (Id. at 240.) She did have weight gain and an excessive appetite and shortness of breath on exertion. (Id. at 240-41.) On examination, Plaintiff was in no acute distress, had a regular heart rate and rhythm, normal pulses, normal gait and station, and normal muscle strength and tone. (Id. at 241.) Her memory, mood, and affect were all within normal limits. (Id. at 242.) She was diagnosed with diabetes mellitus, uncontrolled secondary to diet and life style, morbid obesity, benign hypertension, and hypercholesterolemia.[13] (Id.) She was to

---

[12]Cardiomegaly is "[e]nlargement of the heart." Stedman's Medical Dictionary at 281.

[13]See note 10, supra.

continue on metformin (for treatment of diabetes mellitus) and add Byetta twice a day for her diabetes and to diet and exercise.  (Id.)

When, as instructed, Plaintiff returned to Dr. Parseghian on November 28, she reported that she had been experiencing constant pain in the past two weeks that was a seven on a ten-point scale.  (Id. at 233-38.)  She had been taking the Byetta only once a day.  (Id. at 236.)  She did not have any chest pain.  (Id.)  On examination, she was as before.  (Id. at 237-38.)  She expressed interest in gastric bypass surgery.  (Id. at 238.)

Plaintiff saw Dr. Parseghian again on December 28.  (Id. at 228-32.)  She was then experiencing chest pain, but had not in the past two weeks.  (Id. at 228.)  The Byetta was discontinued, metformin and ACTOS (for treatment of diabetes mellitus) were continued; Lantus (an insulin injection) was increased.  (Id. at 231.)  Her hypertension was described as uncontrolled.  (Id.)

Plaintiff next saw Dr. Parseghian on February 8, 2007.  (Id. at 224-27, 426-29.)  She was feeling okay and had no chest pain or palpations.  (Id. at 224.)  On examination, she was as before.  (Id. at 226.)  Her diabetes was described as uncontrolled; her dosage of Lantus was again increased.  (Id. at 227.)  Her hypertension was improved.  (Id.)

Five days later, Plaintiff consulted an internist, Meenu Sharma, M.D. (M. Sharma), for an evaluation of her high blood pressure and a boil on her back.  (Id. at 419-25.)  Plaintiff was taking her medication regularly, but was taking medication that was not on her list and had changed the dosages.  (Id. at 420, 421.)  She had not been keeping a log of her blood pressure.  (Id. at 424.)  A review of her list of medications revealed that she was not

taking any beta blockers.  (<u>Id.</u> at 421, 424.)  Dr. M. Sharma recommended that Plaintiff exercise and have better diet control.  (<u>Id.</u> at 422.)  Plaintiff was to bring her all her medications, which would then be reviewed and adjusted.  (<u>Id.</u> at 424.)

Plaintiff returned to Dr. N. Sharma for a follow-up visit on February 21.  (<u>Id.</u> at 244-49, 318-23, 461-67.)  She was not currently experiencing any pain, but had been in the past two weeks.  (<u>Id.</u> at 244.)  Specifically, she had left shoulder pain described as "twinges."  (<u>Id.</u> at 246.)  She had not had any significant episode of chest pain since her he had last seen her.  (<u>Id.</u>)  She continued to have shortness of breath on exertion and had leg edema.  (<u>Id.</u>)  Her weight was 238.6 pounds.  (<u>Id.</u> at 244.)  Her hypertension was benign; her diabetes was uncontrolled.  (<u>Id.</u> at 245.)  Dr. N. Sharma thought her shoulder pain was atypical for cardiac ischemia and was more likely a local arthritic problem.  (<u>Id.</u> at 247.)  She was to keep her legs elevated when sitting for a long time, do regular exercise, and lose weight.  (<u>Id.</u>)

On March 13,  Plaintiff again saw Dr. M. Sharma.  (<u>Id.</u> at 411-16.)  She had back pain that a nine on a ten-point scale.  (<u>Id.</u> at 411, 412.)  She was taking her blood pressure medication regularly but felt it was no better controlled.  (<u>Id.</u> at 412.)  She was walking ten to fifteen minutes once or twice a week and was "keeping an eye on her diet."  (<u>Id.</u>)  Her weight was 238 pounds.  (<u>Id.</u> at 411.)  She had started taking insulin for her diabetes.  (<u>Id.</u> at 412.)  Dr. M. Sharma opined that Plaintiff's blood pressure was "getting controlled" and continued her on enalapril, Diovan, Norvasc, and Toprol.  (<u>Id.</u> at 413.)  She recommended that Plaintiff call Dr. Parseghian if her blood sugars stayed low so that her medication could

be adjusted.  (Id. at 414.)  She stressed that Plaintiff needed to lose weight and walk for at least twenty-five minutes every day.  (Id.)

The same day, Plaintiff saw Umesh Inampudi, M.D., at the Grace Hill Neighborhood Health Centers (Grace Hill) in St. Louis.  (Id. at 486-89.)  Her problems were diabetes mellitus, hypertension, coronary artery disease, and obesity.  (Id. at 486.)  She had gotten medication samples from a private physician.  (Id.)  She was started on medications for her diabetes, hypertension, and high cholesterol.  (Id. at 489.)

Two days later, Plaintiff returned to Dr. M. Sharma with complaints of swelling in both feet and legs that had started a month ago and a boil on her mid-back that had developed the day before.  (Id. at 407-10.)  Her weight was 239.5 pounds.  (Id. at 407.)  She denied any chest pain, shortness of breath, and palpitations.  (Id. at 408.)  Her left hip and leg pain was better.  (Id.)  Dr. Sharma thought the boil could be either recurrent herpes zoster or cutaneous herpes and took a culture.  (Id. at 409.)  The leg swelling was due to a combination of obesity, use of Norvasc, and dependent edema.  (Id.)  Plaintiff was to return in one month.  (Id.)

On April 3, she informed Dr. Inampudi that she was not taking her insulin twice a day as instructed but only once a day.  (Id. at 490.)  Compliance with her medications was discussed.  (Id.)  She was to keep a log of her blood sugar levels.  (Id.)  Two weeks later, Plaintiff met with a nutritionist at Grace Hill to discuss portion and carbohydrate control, eating routines and habits, and the need to lose weight.  (Id. at 491.)

Plaintiff next saw Dr. Pareseghian on May 8. (<u>Id.</u> at 451-55.) She reported pain in her lower back and legs in the past two weeks. (<u>Id.</u> at 451.) It was an eight on a ten-point scale. (<u>Id.</u>) Also, she was having occasional chest pain. (<u>Id.</u> at 452.) She was not having any vision problems, shortness of breath, palpitations, depression, or anxiety. (<u>Id.</u> at 452-53.) Her station and gait were within normal limits, as were her muscle tone and strength. (<u>Id.</u> at 454.) She had no pain with range of motion. (<u>Id.</u>) Her obesity had improved; her weight was 226 pounds. (<u>Id.</u> at 451, 454.) Her diabetes had improved; she was to continue taking metformin. (<u>Id.</u> at 454.) Her hypertension had improved; she was to stop taking Norvasc until she saw Dr. Sharma in three days. (<u>Id.</u>)

Plaintiff complained of a generalized body ache and fever when she saw Dr. Parseghian on July 3. (<u>Id.</u> at 456-60.) Her weight was 233 pounds. (<u>Id.</u> at 456.) Her diabetes was uncontrolled and improved; her hypertension and hypercholesterolemia were improved. (<u>Id.</u> at 459.)

Plaintiff had a magnetic resonance imaging (MRI) of her lumbar spine on April 11, revealing a "broad-based minimal disc bulge with a mild posterior disc protrusion" at L4-L5 and "a circumferential disc bulge with a mild posterior disc protrusion" at L5-S1. (<u>Id.</u> at 472.) The impression was of a normal alignment and degenerative changes that could be symptomatic at the L4-L5 and L5-S1 levels. (<u>Id.</u>)

On August 20, Plaintiff saw another physician, Sanjay Bhargava, M.D., in Dr. N. Sharma's practice, for an unscheduled appointment. (<u>Id.</u> at 468-71.) She continued to have atypical chest pain that was reproducible. (<u>Id.</u> at 470.) The pain went down her arm,

sometimes occurred at rest, sometimes occurred when walking.  (<u>Id.</u>)  It was sometimes

heavy, sometimes sharp.  (<u>Id.</u>)  She had chronic shortness of breath and was morbidly

obese.  (<u>Id.</u>)  She was "strongly advised to lose weight" and given refills of her medications.

(<u>Id.</u> at 471.)  She was to return in three months to four months to see Dr. Sharma.  (<u>Id.</u>)

Plaintiff had a colonoscopy on September 11 and was advised to increase the fiber

in her diet to avoid hemorrhoids.  (<u>Id.</u> at 473-74.)

Also before the ALJ were Plaintiff's records from her visits to Southwest Medical

Center on November 29, 2007; January 29, 2008; May 2, 2008; and February 12, 2009.  (<u>Id.</u>

at 493-500.)  The health care provider's signature is illegible.  (<u>Id.</u>)  The records are

primarily in a checklist format and focus on controlling her diabetes and weight.  (<u>Id.</u>)

Additional records before the ALJ were two assessments of Plaintiff impairments by

non-examining evaluators.

In June 2007, Geoffrey Sutton, Ph.D., completed a Psychiatric Review Technique

form for Plaintiff.  (<u>Id.</u> at 434-44.)  He concluded that Plaintiff did not have a medically

determinable mental impairment.  (<u>Id.</u> at 434.)

The same month, a Physical Residual Functional Capacity Assessment (PRFCA) of

Plaintiff was completed by an agency nonmedical consultant.  (<u>Id.</u> at 445-50.)  Her primary

diagnoses were diabetes, acute heart disease, and high blood pressure.  (<u>Id.</u> at 4445.)  Her

secondary diagnosis was morbid obesity.  (<u>Id.</u>)  These impairments resulted in exertional

limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift

or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day.  (<u>Id.</u> at

446.) Her ability to push or pull was otherwise unlimited. (Id.) She had postural limitations of only occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. (Id. at 448.) She should never climb ladders, ropes, or scaffolds. (Id.) She had no manipulative, visual, or communicative limitations. (Id. at 448-49.) She had one environmental limitation, i.e., she should avoid concentrated exposure to hazards. (Id. at 449.)

After the hearing, Plaintiff underwent a pulmonary evaluation by Peter Tuteur, M.D., with the Division of Pulmonary and Critical Care Medicine at the Washington University School of Medicine, and a psychological evaluation by Summer D. Johnson, Ph.D., a licensed psychologist.

Dr. Tuteur measured Plaintiff's pulmonary functioning before and after administration of a bronchodilator. (Id. at 501-02.) He concluded that she had a mildly decreased diffusing capacity and a mild impairment of gas exchange by DLCO.[14] (Id. at 502.) She did not have a significant ventilatory defect. (Id.)

Dr. Johnson evaluated Plaintiff in August 2009. (Id. at 503-10.) Her chief complaints were physical problems and memory problems. (Id. at 503.) Plaintiff forgot to bring a list of her current medications but reported that they were working. (Id.) Her physical problems included an inability to walk far or sit for long without experiencing

_____

[14]"DLCO, also known as the transfer factor of the lung for CO [carbon monoxide], . . . is helpful for evaluating the presence of possible parenchymal lung disease when spirometry and/or lung volume determinations suggested a reduced vital capacity, RV [residual volume], and/or TLC [total lung capacity]." Kevin McCarthy, Pulmonary Function Testing, http://emedicine.medscape.com/article/303239-overview#aw2aab6b4 (last visited Feb. 21, 2012).

stomach pain and leg pain.  (Id.)  Her memory problems were forgetting where she put things.  (Id.)  Dr. Johnson noted that "[n]ot much more information could be gleaned from [Plaintiff] as it was  determined the interpreter [a son] may have been putting words into her mouth."  (Id. at 503-04.)  Dr. Johnson described Plaintiff as being casually dressed, with oily hair, with "below adequate" hygiene and grooming, sitting in a slouched position, with a cooperative attitude and alert facial expression, having good eye contact, and normal motor activity and gait.  (Id. at 504.)  She denied experiencing any problems with her ability to care for her personal needs.  (Id. at 506.)  Her scores on the Bender-Gestalt Visual Motor Test placed her "in the category of likely experiencing some kind of brain impairment."  (Id. at 505.)  Her scores on a test designed to detect malingering suggested that she put forth maximum effort and was not malingering.   (Id. at 506.)  She demonstrated good concentration, persistence, and a moderate pace.  (Id.)  She did not appear to have any problems with social functioning.  (Id.)  She could cook, complete household chores, and go grocery shopping.  (Id.)  Sometimes, she rode the bus.  (Id.)  The diagnosis was cognitive disorder not otherwise specified.  (Id.)  Her current Global Assessment of Functioning

(GAF) was 56.[15]  (Id.)  Her prognosis was "[f]air with appropriate interventions and further evaluation regarding functioning."  (Id.)

Completing a Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Johnson assessed Plaintiff as having moderate limitations in four of six activities related to an ability to understand, remember, and carry out instructions; a mild limitation in one, i.e., her ability to understand and remember simple instructions; and no limitation in her ability to carry out simple instructions.  (Id. at 508.)  Her limitations were due to evidence of brain impairment and problems with recent memory.  (Id.)  Her mental impairments did not affect her ability to interact appropriately with supervisors, co-workers, and the public or to respond to changes in the routine work setting.  (Id. at 509.)  Indeed, no other capabilities were affected by her impairments.  (Id.)

## The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation process, the ALJ first found that Plaintiff last met the insured status requirements on December 31, 2007, and had not engaged in substantial gainful activity during the period from May 31, 2003, through her date last insured.  (Id. at 12-13.)  The ALJ next found that,

---

[15]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

as of the date last insured, Plaintiff had severe impairments of atherosclerotic heart disease, status-post multi-vessel stenting, diabetes mellitus, morbid obesity, and atypical reproducible chest pain.  (Id. at 13.)  Her hypertension and hypercholesterolemia were controlled by medication.  (Id.)  Pulmonary function tests revealed no significant ventilatory defect and a mild impairment of gas exchange.  (Id.)  Thus, the hypertension, high cholesterol, and shortness of breath did not, singly or in combination, cause more than minimal limitations in her ability to work.  (Id. at 13-14.)  Her mental impairment of cognitive disorder, not otherwise specified, did not cause more than a minimal limitation in her ability to perform basic mental work activities and was, therefore, non-severe.  (Id. at 14.)  Specifically, in the area of activities of daily living, she had no limitations.  She was able to cook, perform household chores, shop for groceries, and occasionally, ride the bus.  (Id.) She had no limitation in the area of social functioning.  (Id.)  In the area of concentration, persistence, or pace, she had a mild limitation based on Dr. Johnson's assessment that she could carry out simple instructions and had mild limitations in her abilities to understand and remember simple instructions.  (Id.) There was no evidence of any episodes of decompensation.  (Id.)

Through the day last insured, Plaintiff's impairments did not, singly or in combination, meet or medically equal one of listing-level severity.  (Id. at 15.)  As of the day last insured, she had the residual functional capacity (RFC) to perform a wide range of

light work[16] except for climbing ladders, ropes, and scaffolds and more than occasional stooping, kneeling, crouching, crawling, balancing, and climbing ramps and stairs. (Id.) Also, she could lift and carry ten pounds frequently and twenty pounds occasionally and could stand, walk, and sit for about six hours in an eight-hour work day. (Id.) She should avoid concentrated exposure to hazards. (Id.) The ALJ considered Plaintiff's obesity and found that it did not, alone or in combination with her other impairments, lead to a conclusion of disability. (Id.)

Next, the ALJ assessed Plaintiff's credibility. He noted her responses on the Function Report, her hearing testimony, the medical reports of Drs. N. Sharma, Parseghian, M. Sharma, and Bhargava, and the reports of the two post-hearing consultative examinations. (Id. at 15-19.) He concluded that her treatment records were inconsistent with having debilitating symptoms and the lack of any physician's opinion of disability. (Id. at 19.) He then concluded that with her RFC, Plaintiff could perform her past relevant work as a housekeeper. (Id.)

Accordingly, she was not disabled from October 5, 2006, through December 31, 2007. (Id. at 20.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable

---

[16]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ." **Kirby**

**v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "Severity is not an onerous requirement . . . , but it is also not a toothless standard . . . ."  **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).  Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577,

581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **<u>Wagner v. Astrue</u>**, 499 F.3d 842, 851 (8th Cir. 2007); **<u>Pearsall</u>**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **<u>Buckner v. Astrue</u>**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting <u>Moore</u>, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **<u>Id.</u>** (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **<u>Singh v. Apfel</u>**, 222 F.3d 448, 452 (8th Cir. 2000); **<u>Beckley v. Apfel</u>**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant

work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'"  **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037,

or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) not finding she had severe impairments; (2) improperly assessing her RFC; and (3) failing to cite examples of specific occupations she could perform and the incidence of such work in the national economy.

Severe Impairments.  Plaintiff argues that the ALJ erred "by finding no medically determinable mental and physical impairments, or non-severe physical and mental impairments."  (Pl. Mem. at 14.)  Plaintiff misreads the ALJ's decision.  The ALJ found that as of the December 31, 2007, Plaintiff *had* severe impairments of atherosclerotic heart disease, status-post multi-vessel stenting, diabetes mellitus, morbid obesity, and atypical reproducible chest pain.  He further found that her hypertension, high cholesterol, shortness of breath, and mental impairment were not severe.

As noted above, "[a] severe impairment is defined as one which significantly limits [the claimant's] physical or mental ability to do basic work activities.  The impairment

> must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical

evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms . . . .

**Martise**, 641 F.3d at 923 (8th Cir. 2011) (internal quotations omitted) (first alteration in original).  In the instant case, the medical evidence established that Plaintiff's hypertension and high cholesterol could be controlled by medication, when Plaintiff properly took it.  "'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'"  **Brown v. Astrue**, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).  Moreover, Plaintiff has submitted no evidence that either her hypertension or high cholesterol significantly limited her ability to work during the relevant time period.  See **Johnson v. Astrue**, 628 F.3d 991, 992-93 (8th Cir. 2011) (finding that claimant who had "been aggressively treated and occasionally hospitalized for severe hypertension" was not disabled by such when she had submitted no evidence that the hypertension had rendered her unable to work).

Plaintiff's claims of severe shortness of breath and a mental impairment are similarly unavailing.  As noted by the ALJ, pulmonary function tests revealed "a *mildly* decreased diffusing capacity" and "*mild* impairment of gas exchange."  During the relevant time period, Plaintiff consistently had a fair affect and reported not being depressed.  She also reported that she had no problems following instructions and that her impairments did not affect her abilities to concentrate, remember, complete tasks, or get along with others.  Although twenty months after the date Plaintiff was last insured, Dr. Johnson found a cognitive disorder,

Plaintiff had been able to work with such disorder and that was no evidence that any such disorder had worsened after December 2007.

Plaintiff also characterizes the ALJ's reference to her low back complaints as perhaps being "symptomatic" as discounting those complaints. (Pl. Mem. at 14.) The use of "symptomatic," however, is not the ALJ's choice; the MRI findings use that term.

Next, Plaintiff notes that she has difficulty speaking and understanding English. The Court notes that Plaintiff disclaimed any such problem when applying, although the assistance of an interpreter was offered, and that her husband interpreted for her at the hearing without hers or counsel's objection. Moreover, an inability to speak and understand English is not a severe impairment. See **Nguyen v. Chater**, 75 F.3d 429, 430 (8th Cir. 1996) (affirming finding that claimant who could not speak English or read or write in any language did not have a severe impairment limiting her ability to do basic work activities).[17]

Plaintiff's RFC. Plaintiff next argues that the ALJ erred in assessing her RFC, specifically by not including her fatigue and need to rest.

"'The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC.'" **Martise**, 641 F.3d AT 923 (quoting Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)). "'However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.'" **Id.** (quoting Vossen, 612 F.3d at 1016). And,

---

[17]The Court notes that the inability to communicate in English is relevant when applying the Medical-Vocational Guidelines. See **Higgins v. Apfel**, 222 F.3d 504, 505-06 (8th Cir. 2000).

as noted above, an ALJ's determination regarding a claimant's RFC may be influenced by a determination that her allegations are not credible.  **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010).  In the instant case, including Plaintiff's claims of fatigue in her RFC would require finding that her complaints of such are credible.

Relevant to the ALJ's finding that Plaintiff's complaints were not entirely credible are the absence of any supporting objective evidence, see **id.** at 968; the various inconsistencies, e.g., stating on one report that she did not use public transportation and stating to Dr. Johnson that she sometimes rode the bus, reporting that her impairments did not affect her ability to remember or concentrate but telling Dr. Johnson she had difficulty remembering, see **Wiese**, 552 F.3d at 734; her failure to be compliant with her medications and to follow doctors' instructions to diet and exercise, see **Bradley v. Astrue**, 528 F.3d 1113, 1115 (8th Cir. 2008); and her sporadic work history, see **Buckner**, 646 F.3d at 558.

Past Relevant Work.  The ALJ concluded that, with her RFC, Plaintiff could perform her past relevant work as a housekeeper as it is actually performed.  "The ALJ will find that a claimant is not disabled if [s]he retains the RFC to perform:

> 1.  The actual functional demands and job duties of a  particular past relevant job; or
>
> 2.  The functional demands and job duties of the occupation as generally required by employers throughout the national economy."

**Wagner**, 499 F.3d at 853 (internal quotations omitted).  As noted above, however, when making this determination, the ALJ is  to review the physical and mental demands of the claimant's past relevant work.  See 20 C.F.R. § 404.1520(e).

The ALJ did not inquire of Plaintiff about how the physical and mental demands of her past work as a motel housekeeper. Her Work History Report is of no assistance; it describes exertional activities that required a total of at least thirty hours in an eight-hour day. Nor did the ALJ question the number of employers Plaintiff had or the similarity in names, both of which might be relevant to her ability to perform the work of a housekeeper.

Nor did the ALJ inquire of the VE about the job of motel housekeeper as defined in the *Dictionary of Occupational Titles* (DOT). Had he done so, the VE might have referred to the job of housekeeper as described in DOT 321.137-010. See Dictionary of Occupational Titles, 1991 WL 672778 (4th Ed. Rev. 1991). Consistent with the ALJ's RFC findings, this job is defined as light work. Id. It also requires an ability to use correct English – an ability Plaintiff does not have. Id. If Plaintiff's work as a housekeeper focused on the cleaning of the motel, the VE might have referred to the job of cleaner, including housekeeper, as defined in DOT 381.687-014. Dictionary of Occupational Titles, 1991 WL 673257 (4th Ed. Rev. 1991). This job, however, is heavy work, see id., which is inconsistent with Plaintiff's RFC.

In **Lowe v. Apfel**, 226 F.3d 969 (8th Cir. 2000), the Eighth Circuit reversed and remanded a case in which the ALJ had failed to examine the specific duties of the job that according to one DOT classification required an ability the claimant did not have and for which neither the VE nor the ALJ listed the specific requirements of the job that they found the claimant had performed. **Id.** at 973. The court concluded that the ALJ should have examined the specific duties of the position and determined whether it required an ability that

the claimant was found not to possess. Similarly, in the instant case, the ALJ on remand should inquire into the demands of the job Plaintiff performed and the demands of the job as defined in the DOT and should then determine whether those demands are consistent with Plaintiff's RFC.

## Conclusion

The ALJ's classification of Plaintiff's impairments as severe or nonsevere and his RFC findings are supported by substantial evidence on the record as a whole. The ALJ's finding that she could return to past relevant work is not supported by substantial evidence on the record as a whole. Accordingly, the case must be remanded for development of the record on the demands of such work as Plaintiff performed it and as it is actually performed and for such other inquiries as necessary.[18] Therefore, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings as set forth above pursuant to sentence four of 42 U.S.C. § 405(g).

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  day of February, 2012.

---

[18]On remand, the Court recommends that an interpreter who is not a family member be used when questioning Plaintiff.